**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| A, a minor, and B, a minor, and C, a minor, D, | : | CIVIL ACTION |
| a minor, and E, a minor, by and through their | : | |
| natural mother, Parent 1, on their own behalf and on: | | NO. 08-4100 |
| behalf of any and all similarly situated persons; | : | |
| and Parent 1, on her own behalf, and on behalf of | : | |
| any and all similarly situated persons; and, | : | |
| N, a minor, by and through his natural mother, | : | |
| Parent 9, on her own behalf and on behalf of any | : | |
| and all similarly situated persons; and Parent 9, | ; | |
| on her own behalf, and on behalf of any and all | : | |
| similarly situated persons, | : | |
| Plaintiffs, | : | |
| vs. | : | |
| | : | |
| MICHAEL NUTTER, in His Official Capacity | : | |
| As Mayor of the City of Philadelphia; ANNE | : | |
| MARIE AMBROSE, in Her Official Capacity as | : | |
| Commissioner of the Department of Human | : | |
| Services ("DHS") of the City of Philadelphia; | : | |
| ESTELLE B. RICHMAN, in Her Official Capacity | : | |
| as Secretary of the Department of Public | : | |
| Welfare ("DPW") of the Commonwealth of | : | |
| Pennsylvania EDWARD G. RENDELL, in His | : | |
| Official Capacity as Governor of the Commonwealth : | | |
| of Pennsylvania, and JOHN/JANE DOES # # 1-100, | : | |
| Defendants. | : | |
| | : | |

DuBOIS, J._____August 27, 2010

# M E M O R A N D U M

I.      INTRODUCTION. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

II.     FACTUAL BACKGROUND. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

III.    LEGAL STANDARD. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7
        A.      Rule 12(b)(1) Motions to Dismiss .. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7
        B.      Rule 12(b)(6) Motions to Dismiss .. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7

IV.     DISCUSSION. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9
        A. Jurisdictional Challenges Under Rule 12(b)(1) . . . . . . . . . . . . . . . . . . . . . . . . . . 9

| | 1. | Article III Standing. | 9 |
| | | a. Injury In Fact. | 10 |
| | | b. Causation. | 15 |
| | | (i) City Defendants. | 15 |
| | | (A) Plaintiff A. | 16 |
| | | (B) Plaintiff C. | 17 |
| | | (C) Plaintiff E. | 18 |
| | | (ii) Commonwealth Defendants. | 20 |
| | | c. Redressability. | 21 |
| | 2. | Rooker-Feldman. | 22 |
| B. | Challenges Under Rule 12(b)(6). | | 27 |
| | 1. | Plaintiffs' Third Amended Complaint States a Cause of Action Under Monell Against the City Defendants. | 27 |
| | 2. | Plaintiffs' Third Amended Complaint States a Claim Against the Commonwealth Defendants. | 31 |
| | | a. Plaintiffs Plead Sufficient Facts to Support a Claim Against Commonwealth Defendants. | 31 |
| | | b. Plaintiffs Plead Facts Sufficient to Confer Subject Matter Jurisdiction Over the Claims Against the Governor. | 32 |
| | | c. Plaintiffs Have Sufficiently Alleged Involuntary State Custody. | 34 |
| | | d. Plaintiff Parent 1 Has Not Alleged a Violation of Her Own Rights, and Her Individual Claims Against All Defendants Must Be Dismissed | 35 |

| V. | CONCLUSION. | 36 |

## I.     INTRODUCTION

In this case, plaintiffs,  minor children in the custody of the City of Philadelphia's

Department of Human Services ("DHS") and their natural parents, assert claims under 42 U.S.C.

§ 1983 against defendants, Michael Nutter, the Mayor of Philadelphia, and Anne Marie

Ambrose, the Commissioner of DHS ("City Defendants"); Estelle B. Richman, the Secretary of

the Department of Public Welfare of Pennsylvania ("DPW"),[1] and Edward G. Rendell, the

_____

[1] The Court notes that Estelle Richman resigned as Secretary of the Department of Public Welfare on December 31, 2009.  She is currently the Chief Operating Officer at the United States Department of Housing and Urban Development.  Accordingly, pursuant to Federal Rule of Civil

Governor of Pennsylvania ("Commonwealth Defendants"); and John and Jane Does # 1-100. Specifically, plaintiffs claim that their Fourteenth Amendment rights have been violated by a twenty-two year pattern and practice of unsafe child welfare policies, and seek declaratory and injunctive relief on behalf of a class of similarly situated children and parents.

Presently before the Court are two motions: (1) City Defendants' Motion to Dismiss Plaintiffs' Third Amended Complaint, filed September 17, 2009, and (2) Commonwealth Defendants' Motion to Dismiss the Third Amended Complaint, filed September 24, 2009. Plaintiffs concede in their response to the City Defendants' motion that plaintiffs B, D, N and Parent 9 do not have Article III standing to pursue this case.[2] Thus, the claims of plaintiffs B, D, N and Parent 9 are voluntarily dismissed, and the Court will not address arguments pertaining to those named plaintiffs in this Memorandum.

For the reasons set forth below, City Defendants' motion is denied. Commonwealth Defendants' motion is granted in part, and denied in part. The Court grants Commonwealth Defendants' motion with respect to Parent 1's individual claims, and dismisses the individual claims of Parent 1 and her claims on behalf of similarly situated parents against all defendants. In all other respects, Commonwealth Defendants' motion is denied.

## II. FACTUAL BACKGROUND

Plaintiffs initiated this case by filing a class action complaint against defendants on

---

Procedure 25(d), the current Secretary of the Department of Public Welfare, Harriet Dichter, is substituted as defendant for Estelle Richman.

[2] Specifically, plaintiff B has been adopted and Parent 1's parental rights have been terminated as to plaintiff B; plaintiff D has been admitted to a psychiatric hospital, and as a result is no longer in DHS custody; and plaintiff N is living with Parent 9, and as such, is no longer in DHS custody. (Pls.' Resp. 23-25.)

August 25, 2008.  Pursuant to a joint stipulation, plaintiffs filed a First Amended Complaint on

December 17, 2008, and a Second Amended Complaint on March 4, 2009.  Thereafter, City

Defendants filed a motion to dismiss the Second Amended Complaint on April 24, 2009, and

Commonwealth Defendants filed a motion to dismiss on May 1, 2009.  On June 25, 2009,

plaintiffs filed a response to these motions, and attached a Proposed Third Amended Complaint.

By order dated August 3, 2009, the Court granted plaintiffs "one final opportunity to submit a

complaint which addresses the issues raised in defendants' Motions to Dismiss the Second

Amended Complaint."  On August 18, 2009, plaintiffs filed the Third Amended Complaint that

is at issue in the pending motions to dismiss.

Plaintiffs in this action are minor children currently in the custody of DHS and their

natural parents.  (3d Am. Compl. ¶¶ 24, 33.)  Specifically, the Third Amended Complaint

identifies plaintiffs as: minor children A, B, C, D, and E, by and through their natural mother,

Parent 1, and on behalf of all similarly situated minor children; minor child N, by and through his

natural mother, Parent 9, and on behalf of all similarly situated children; and Parents 1 and 9, on

their own behalf, and on behalf of all similarly situated parents.[3]  (Id. ¶¶ 31, 32.)  As noted above,

the claims of plaintiffs B, D, N and Parent 9 are voluntarily dismissed, and the Court will only

address arguments pertaining to plaintiffs A, C, E, and Parent 1 in this Memorandum.

Plaintiffs define the proposed plaintiff class as: "All children currently in custody of

DHS, or who come into DHS custody during the pendency of this action and during the pendency

of any final judgment granting relief for the benefit of class members in this action, including the

---

[3] Plaintiffs are identified by pseudonyms in the Third Amended Complaint for the
purpose of confidentiality.

parents or guardians of those children." (Id. ¶ 54.) More than 41,000 children and approximately 82,000 parents currently receive services from DHS, and "a significant percentage of those approximately 41,000 children are currently in DHS custody." (Id. ¶ 56.) Plaintiffs allege that individually and as a class, they are "subject to DHS's dangerous practices and policies that violate [the] Constitutional right to reasonable safety while in DHS custody." (Id. ¶ 57.)

Defendants in this case are Mayor Nutter and Commissioner Ambrose, in their official capacities ("City Defendants"); Governor Rendell and Secretary Richman, in their official capacities ("Commonwealth Defendants"); and defendants Jane and John Does # 1-100.

In the Third Amended Complaint, plaintiffs present averments related to the violation of named plaintiffs' constitutional rights, which are described in full below. See Part IV.A.1. Plaintiffs also present factual allegations that DHS has engaged in a twenty-two year pattern and practice of unsafe child welfare policies, stating that "on a consistent basis since [] or around the year 1987, DHS has been an agency in persistent, systemic crisis, the results of which have included abuse, neglect and death of children receiving services from the agency." (3d Am. Compl. ¶ 64.) Plaintiffs cite a number of reports, commissions, and legal proceedings,[4] and claim that these materials identify common areas for reform at DHS, including the implementation of greater child safety protections. (See id. ¶¶ 53-174.)

_____

[4] Plaintiffs cite the following documents: the 1987 report, "Philadelphia Child Protective Services: A Report to the Secretary of Public Welfare" (3d Am. Compl. ¶¶ 66-71); the 1990 DHS report, entitled "Towards a Better Future for Philadelphia's Children" (id. ¶¶ 83-87); the settlement of the 1990 federal class action, In re Baby Neal (id. ¶¶ 88-101); the 2007 report issued by Mayor Street's Child Welfare Review Panel (id. ¶¶ 154-57); the 2008 grand jury report on the death of Danieal Kelly (id. ¶¶ 146-53); the January 2009 report of the Community Oversight Board, entitled "Report on the Progress from the City of Philadelphia Community Oversight Board for the Department of Human Services" (id. ¶¶ 160-62); and the Plan and Budget published by DHS on July 10, 2009 (id. ¶¶ 172-73).

In addition to claims against the City Defendants, plaintiffs allege that Commonwealth Defendants "act[ed] pursuant to an affirmative Pennsylvania state policy of purposeful refusal to compel DHS to comply with reasonably safe child welfare practices." (Id. ¶ 141.) In support of this claim, plaintiffs state that DPW revoked DHS's full child welfare program licenses in 1988, 1992, and 2007, as a result of DHS's failure to operate a safe child welfare agency. On all three occasions, plaintiffs aver that DPW granted DHS a six-month provisional license, which was renewed three times, and then restored DHS's full license despite the fact that DHS was not a reasonably safe child welfare agency. (Id. ¶¶ 76-82, 102-114, 127-133.) Plaintiffs further allege that DPW restored the full licenses for the sole reason that Pennsylvania allows the renewal of provisional licenses only three times, and if DPW did not restore the full license to DHS, it "would have been required by law to take over responsibility for DHS operations." (Id. ¶ 135.)

Plaintiffs aver that this pattern and practice of misconduct has deprived both individual named plaintiffs and the proposed class of their Fourteenth Amendment rights, including "the right not to be harmed while in state custody" and "reasonable protection from harm or substantial risk of imm[i]ent harm while in state custody"; "the right to basic safety and medical care while in state custody" and "to an agency capable of ensuring the appropriate medical treatment"; "the right not to be placed in substantial risk of imm[i]ent harm through participation in a flawed state system [that] lack[s] appropriate safety controls" and "engag[es] in widespread falsification of records"; and "the right to a safe and appropriate agency that operates pursuant to reasonable professional standards and within the bounds of prudent professional judgment." (Id. ¶ 300.) As a result of these alleged harms, plaintiffs seek certification as a class action and declaratory and injunctive relief, including the appointment of "a Monitor, receiver, Trustee, or

Master with full authority to oversee and direct the implementation of all injunctive relief granted

. . . ." (Id. at 99.)

## III. LEGAL STANDARD

### A. Rule 12(b)(1) Motions to Dismiss

Federal Rule of Civil Procedure 12(b)(1) provides that a court may dismiss a complaint

for "lack of jurisdiction over the subject matter . . . ." Fed. R. Civ. P. 12(b)(1). In evaluating a

Rule 12(b)(1) motion, the Court first must determine whether the motion attacks the complaint

on its face or on its facts. Carpet Group Int'l v. Oriental Rug Imps. Ass'n, 227 F.3d 62, 69 (3d

Cir. 2000) (citing Mortensen v. First Fed. Sav. & Loan Ass'n, 549 F.2d 884, 891 (3d Cir. 1977)).

"Facial attacks . . . contest the sufficiency of the pleadings, and the trial court must accept the

complaint's allegations as true." Turicentro, S.A. v. Am. Airlines, Inc., 303 F.3d 293, 300 n.4

(3d Cir. 2002). In reviewing a facial attack, a court may rely on documents referenced within the

complaint and attached thereto but must view them in the light most favorable to the nonmoving

party. See Gould Elecs., Inc. v. United States, 220 F.3d 169, 176 & n.6 (3d Cir. 2000); Pension

Benefit Guar. Corp. v. White Consol. Indus., 998 F.2d 1192, 1196 (3d Cir. 1993). "In contrast, a

trial court considering a factual attack accords plaintiff's allegations no presumption of truth" and

"must weigh the evidence relating to jurisdiction, with discretion to allow affidavits, documents,

and even limited evidentiary hearings." Turicentro, 303 F.3d at 300 n.4; see Gould Elecs., 220

F.3d at 178 (citing Mortensen, 549 F.2d at 891).

### B. Rule 12(b)(6) Motions to Dismiss

Rule 12(b)(6) of the Federal Rules of Civil Procedure provides that, in response to a

pleading, a defense of "failure to state a claim upon which relief can be granted" may be raised

by motion. In analyzing a motion to dismiss pursuant to Rule 12(b)(6), the Court "accept[s] all factual allegations as true, [and] construe[s] the complaint in the light most favorable to the plaintiff . . . ." Phillips v. County of Allegheny, 515 F.3d 224, 231, 233 (3d Cir. 2008) (quoting Pinker v. Roche Holdings, Ltd., 292 F.3d 361, 374 n.7 (3d Cir. 2002)).

"To survive a motion to dismiss, a civil plaintiff must allege facts that 'raise a right to relief above the speculative level . . . .'" Victaulic Co. v. Tieman, 499 F.3d 227, 234 (3d Cir. 2007) (quoting Bell Atl. Corp. v. Twombly, 550 U.S. 544, 555 (2007)). In other words, a complaint must contain "sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" Ashcroft v. Iqbal, 129 S. Ct. 1937, 1949 (2009) (quoting Twombly, 550 U.S. at 570). To satisfy the plausibility standard, a plaintiff's allegations must show that defendant's liability is more than "a sheer possibility." Id. "Where a complaint pleads facts that are 'merely consistent with' a defendant's liability, it 'stops short of the line between possibility and plausibility of entitlement to relief.'" Id. (quoting Twombly, 550 U.S. at 557).

In Twombly, the Supreme Court utilized a "two-pronged approach" which it later formalized in Iqbal. Iqbal, 129 S. Ct. at 1950; Fowler v. UPMC Shadyside, 578 F.3d 203, 210-11 (3d Cir. 2009). Under this approach, a district court first identifies those factual allegations which constitute nothing more than "legal conclusions" or "naked assertions." Twombly, 550 U.S. at 555, 557. Such allegations are "not entitled to the assumption of truth" and must be disregarded. Iqbal, 129 S. Ct. at 1950. The court then assesses "the 'nub' of the plaintiff['s] complaint—the well-pleaded, nonconclusory factual allegation[s] . . .—to determine" whether it states a plausible claim for relief. Id.

**IV. DISCUSSION**

**A. Jurisdictional Challenges Under Rule 12(b)(1)**

As discussed in Part III. A above, in evaluating a Rule 12(b)(1) motion, the Court first must determine whether the motion attacks the complaint on its face or on its facts. Carpet Group Int'l v. Oriental Rug Imps. Ass'n, 227 F.3d 62, 69 (3d Cir. 2000) (citing Mortensen v. First Fed. Sav. & Loan Ass'n, 549 F.2d 884, 891 (3d Cir. 1977)).

In this case, City Defendants and Commonwealth Defendants challenge plaintiffs' Article III standing and City Defendants challenge the Court's jurisdiction under the Rooker-Feldman doctrine.[5] City Defendants present two arguments that attack plaintiffs' Third Amended Complaint on the facts: (1) that collateral estoppel precludes plaintiffs from establishing the injury in fact element of standing, and (2) that Rooker-Feldman bars plaintiffs' claims in this Court. Thus, with respect to those claims, this Court may consider evidence outside the pleadings to determine whether the Court has subject matter jurisdiction over plaintiffs' claims. The remainder of defendants' 12(b)(1) challenges attack plaintiffs' Third Amended Complaint on its face. As to those claims, the Court will evaluate the sufficiency of plaintiffs' pleadings, and accept the allegations contained in the Third Amended Complaint as true.

**1. Article III Standing**

Article III of the Constitution of the United States provides that a federal court may exercise jurisdiction only where there is an actual case or controversy to be decided. See, e.g., Golden v. Zwickler, 394 U.S. 103, 108 (1969). Standing is a legal device, the "core component

---

[5] This doctrine is based on two Supreme Court cases, Rooker v. Fidelity Trust Co., 263 U.S. 413 (1923), and District of Columbia Court of Appeals v. Feldman, 460 U.S. 462 (1983).

[of which] is an essential and unchanging part of the case-or-controversy requirement of Article III." Lujan v. Defenders of Wildlife, 504 U.S. 555, 560 (1992). Standing limits a plaintiff's ability to invoke the power of the federal courts. "In essence the question of standing is whether the litigant is entitled to have the court decide the merits of the dispute or of particular issues." Warth v. Seldin, 422 U.S. 490 (1975). As the standing requirement is derived from Article III, it is a threshold inquiry in every case, one for which "[t]he party invoking federal jurisdiction bears the burden" of proof. Lujan, 504 U.S. at 561. To meet this burden, the party seeking federal jurisdiction must establish "the irreducible constitutional minimum of standing," which is composed of three elements:

> First, the plaintiff must have suffered "an injury in fact"—an invasion of a legally protected interest which is (a) concrete and particularized and (b) "actual or imminent, not 'conjectural' or 'hypothetical.'" Second, there must be a causal connection between the injury and the conduct complained of—the injury has to be "fairly . . . trace[able] to the challenged action of the defendant, and not . . . th[e] result [of] the independent action of some third party not before the court." Third, it must be "likely," as opposed to merely "speculative," that the injury will be "redressed by a favorable decision."

Id. at 560-61 (internal citations omitted).

In their motions to dismiss, defendants present arguments that attack each element of standing—injury in fact, causation, and redressability. The Court addresses their arguments below, and concludes that plaintiffs do all establish "the irreducible constitutional minimum of standing" under Lujan.

### a. Injury In Fact

City Defendants contend that this suit must be dismissed because plaintiffs lack an

"injury in fact" sufficient to establish Article III standing, and assert two arguments in support of their position: (1) plaintiffs fail to allege that plaintiffs face imminent injury; and (2) the doctrine of collateral estoppel bars plaintiffs A, C, and E from claiming that they faced imminent injury on the date of filing the Third Amended Complaint.

With respect to their first argument, City Defendants assert that plaintiffs may not rely solely on allegations of past injury to establish that plaintiffs face the imminent injury required by Article III standing. (City Defs.' Mot. 20.) "[A]llegations (or even proof) of widespread deprivations of citizens' constitutional rights by a state or municipal bureaucracy will not support a claim for injunctive relief if the named plaintiffs seeking such relief have not alleged or shown that they, themselves, face specific and imminent harm." (Id. at 16.)

City Defendants rely on City of Los Angeles v. Lyons, 461 U.S. 95 (1983), in arguing that plaintiffs have not sufficiently alleged imminent harm. In that case, the Supreme Court determined that Lyons did not have standing to seek an injunction that would prohibit police officers from using allegedly dangerous choke holds because he did not demonstrate that he was "likely to suffer future injury." Id. at 105. Rather, the Court concluded that establishing standing would require Lyons "not only to allege that he would have another encounter with the police but also to make the incredible assertion either (1) that all police officers in Los Angeles always choke any citizen with whom they happen to have an encounter" or "(2) that the City ordered or authorized police officers to act in such manner." Id. at 105-106.

Applying Lyons to the instant case, City Defendants argue that "[p]laintiffs do not allege, nor can they show, that all or most of DHS's caseworkers permit children under their supervision to be injured" or that "all or most children under DHS supervision have suffered actionable

injury because of the conduct of DHS's caseworkers." (City Defs.' Mot. 19-20 (internal footnotes omitted).) City Defendants emphasize that "[e]xposure to risk does not equate to imminent injury." (Id. at 21.) This Court does not agree that Lyons is dispositive of this issue.

The Lyons Court, however, recognized that if Lyons had instead alleged that future injury was imminent because of an authorized policy—not just a random act by a minority of officers—his allegations would have properly invoked federal jurisdiction. Plaintiffs' averments in this case meet that standard enunciated by the Lyons Court in that they allege future injury is imminent because of a policy or custom either acquiesced in or authorized by the City Defendants. In this respect, plaintiffs are similar to plaintiffs in Clark K. v. Guinn, No. 06-1068, 2007 U.S. Dist. LEXIS 35232 (D. Nev. May 9, 2007), a case that challenged deficiencies in the foster care system in Nevada. The Clark K. court explained,

> [plaintiffs] are in the Defendants' custody and will be so until they are returned to their parents, are adopted, or reach the age of majority. They cannot avoid exposure to Defendants' challenged conduct. The alleged systemic deficiencies in the Clark County and Nevada foster care system are similar to an injurious policy and different from the random act at issue in Lyons. The alleged pattern and practice in this case presents a substantial likelihood that the alleged injury will occur.

Clark K., No. 06-1068, 2007 U.S. Dist. LEXIS 35232, at *12.

As in Clark K., plaintiffs in this case provide detailed allegations that City Defendants "ha[ve] engaged in a twenty-year pattern and practice of failure to operate in accordance with reasonable professional standards, and to thereby comply with DHS's Constitutional duty to protect children in DHS custody from harm or risk of imm[i]nent harm." (3d Am. Compl.¶ 58.) More specifically, plaintiffs aver that DHS commonly engaged in a longstanding practice of

backdating and falsifying child files; failed to create conduct proper safety assessments and safety plans; failed to provide full information on medical conditions and treatment to caregivers; and failed to properly investigate reports of abuse. (See, e.g., id. ¶¶ 104-15, 124, 162, 173, 267-82.) As a result, the Court concludes that plaintiffs' allegations of an injurious pattern and practice "present[] a substantial likelihood that the alleged injury will occur" in the future. See Clark K., No. 06-1068, 2007 U.S. Dist. LEXIS 35232, at *12.

Second, City Defendants argue that collateral estoppel bars plaintiffs from claiming that they faced imminent injury as of the date of filing their Third Amended Complaint on August 13, 2009. (City Defs.' Mot. 27-28.) In their motion, City Defendants state that Judge Daniel Anders of the Court of Common Pleas conducted hearings as to the placement conditions of all plaintiffs on August 12, 2009, and determined that each child was reasonably safe. (Id.) City Defendants submit as exhibits to their motion plaintiffs' Post-Adjudication Hearing and Order records regarding the August 12th hearing, a transcript of that hearing, and the declaration of Ossie M. Parker, the DHS social worker assigned to plaintiffs since July 2008. (See id. Ex. A-E, H, and P.)

Under both Pennsylvania and Third Circuit law, the application of collateral estoppel requires that: "(1) the identical issue was previously adjudicated; (2) the issue was actually litigated; (3) the previous determination was necessary to the decision; and (4) the party being precluded from relitigating the issue was fully represented in the prior action." Jean Alexander Cosmetics, Inc. v. L'Oreal USA, Inc., 458 F.3d 244, 249 (3d Cir. 2006); see also Office of Disciplinary Counsel v. Kiesewetter, 889 A.2d 47, 50-51 (Pa. 2005). Applying this standard, City Defendants assert that (1) the issue of safety was adjudicated by the Court of Common Pleas

on August 12, 2009—just one day prior to plaintiffs' filing of their Third Amended Complaint; (2) plaintiffs had a full opportunity to litigate the issue of their safety at the August 12th hearing; (3) the Court of Common Pleas was statutorily required to determine the issue of plaintiffs' safety under 42 Pa. § 6351(f); and (4) the plaintiffs were fully represented by counsel at the hearing. (City Defs.' Mot. 30.)

In response, plaintiffs argue that "the question of whether plaintiffs are safe on a particular day is not dispositive [of] the federal claims in this litigation. Rather, different and additional factual issues must be litigated to determine whether Plaintiffs are at risk of imminent harm . . . as a result of the longstanding customs and practices of DHS in derogation of child safety standards." (Pls.' Resp. 136.) This Court agrees. While the Court of Common Pleas determined that plaintiffs were reasonably safe in their immediate placements on August 12, 2009, the scope of that court's inquiry was narrower than the questions posed in the present litigation. For example, the Court of Common Pleas did not have the opportunity to determine factual questions relating to the customs or practices of DHS that are contrary to child safety, including the alleged pattern and practice of falsifying and backdating child safety records and failing to accurately and timely investigate reports of abuse and neglect. (See Pls.' Resp. 137-39.) Thus, the issue whether plaintiffs face imminent injury for the purposes of Article III standing is not an "identical issue" to the that which was litigated and adjudicated in the Court of Common Pleas. Accordingly, the Court rejects City Defendants' argument (and supporting evidence) that the doctrine of collateral estoppel precludes plaintiffs from establishing the injury in fact element of standing. To the contrary, the Court concludes that plaintiffs have suffered actual, or face imminent, injury sufficient to invoke federal jurisdiction.

### b. Causation

#### (i) City Defendants

City Defendants aver that "plaintiffs have failed to point to facts sufficient to show causation—i.e., that the conduct of which they complain is about to cause them injury." (City Defs.' Mot. 23.) Plaintiffs respond by arguing that City Defendants "ha[ve] failed to operate in a manner that assures child safety and comports with reasonable professional practices." (Pls.' Resp. 117.) Continuing, plaintiffs argue that while some acts of harm occurred during plaintiffs' residence at out-of-state institutions, this is no reason to "disregard[] the many allegations concerning DHS's knowledge of plaintiffs' abuse, failure to remove Plaintiffs from the abusive facilities, failure to monitor the placements appropriately, failure to investigate reports of abuse while the children are in placement, and failure to provide the outside agencies with appropriate medical history and instructions." (Id. at 119.)

In their Third Amended Complaint, plaintiffs review a twenty-year history of DHS safety violations as memorialized by numerous reports, commissions, and plans for reform. Among these violations, plaintiffs repeatedly allege that DHS persists in its failure to conduct safety assessments for children in its care, including those in out-of-home placements, and lacks any protocol for assessing safety and developing safety plans for cases. (3d Am. Compl. ¶ 124, 162.)

These general allegations are supported by specific allegations of past injury to individual plaintiffs A, C, and E, which the Third Amended Complaint avers were caused by City Defendants' practices with respect to child safety. The Court will review below the allegations of injury to plaintiffs A, C, and E, which demonstrate that plaintiffs have satisfied the causation element of Article III standing.

## (A)    Plaintiff A

The Third Amended Complaint alleges that plaintiff A "suffered from injuries and disabilities he sustained while in DHS custody from the abuse of his caretakers." (3d Am. Compl. ¶ 184.)  DHS failed to provide his caretakers with all relevant medical information, which led to overdoses of medication due to "sloppy administration, lack of oversight, and DHS failure to provide his caretakers with all relevant medical information regarding his care." (Id. ¶ 185.)  Over-medication led plaintiff A to develop liver problems and become obese so that he could not support his own weight. (Id. ¶¶ 186-87.)  As a result, plaintiff A had screws placed in his hips in 2004, which cause constant physical pain. (Id. ¶ 188.)  Plaintiff A is currently placed at Benchmark Behavioral Health Hospital in Utah, and plaintiffs allege that DHS has not advised Benchmark on plaintiff A's medical conditions. (Id. ¶¶ 184, 190.)  For example, he was instructed to use a wheelchair following the operation on his hips, and has not received one. (Id. ¶ 191.)  Plaintiffs state that "DHS has been advised of these medical issues numerous times but has not taken any actions to provide for his appropriate care." (Id.)  Further, plaintiffs aver that "[f]rom 2004 until the present time, DHS has been on notice, or should have known, that severe child abuse has been documented at Benchmark in Utah. . . .  DHS has conducted no independent evaluation of the facility's safety practices or whether [plaintiff] A has been affected in any manner" by the abuse at Benchmark. (Id. ¶¶ 203-04.)  By failing to remove plaintiff A from a facility where abuse has been documented and he has been injured, plaintiffs argue that DHS has "neglected the care and safety of [plaintiff] A, and deprived [plaintiff] A of his federal right to safe and professional care while in state custody." (Id. ¶ 205.)

Plaintiffs also allege that at a previous residential treatment facility, a supervisor broke

plaintiff's A leg while trying to restrain him and another staff member broke plaintiff A's arm. DHS was aware of these violent acts, but failed to protect A or review reports of abuse in a professional manner. (Id. ¶¶ 194-96.) Likewise, plaintiffs allege that "[plaintiff] A was beaten in an unsafe foster home by a foster parent assigned to [plaintiff] A." (Id. ¶ 197.) Parent 1 and plaintiff A's sister made multiple reports to DHS with respect to the foster parent's abusive conduct, including that the foster parent allowed her boyfriend to beat plaintiff A. (Id. ¶¶ 198-99.) Plaintiff A's social worker did not act upon these reports of abuse or make required home visits. (Id. ¶ 200.) The Third Amended Complaint also alleges that "as a result of DHS's neglect of the proper treatment and care of [plaintiff] A, the child has developed psychological and emotional disabilities directly attributable to DHS's failures to provide for his safe care and wellbeing during DHS's long period of custody of the child." (Id. ¶ 192.)

### (B)     Plaintiff C

With respect to plaintiff C, the Third Amended Complaint alleges that "in the course of her time in DHS custody, she has been in approximately twenty (20) different unsafe residential settings, including group homes, foster homes, mental institutions, and hospitals" and "DHS has failed to adequately supervise of investigate [plaintiff] C's conditions of custody." (Id. ¶¶ 218, 236.) "Accordingly, DHS has deprived [plaintiff] C of her federal right to safe and professional care while in state custody." (Id. ¶ 237.) She currently resides in a treatment facility in Georgia. (Id. ¶¶ 218-19.) At the time of the filing of the Third Amended Complaint, plaintiff C's arm was broken due to the use of restraints; this is the second time her arm has been broken while in DHS custody. (Id. ¶¶ 220-21.) C has also suffered other injuries while at the Georgia facility: her head was thrown against a wall, her face was burned, and she was punched in the eye

"as a result of neglect by the caretakers supposed to be doing DHS's job of assuring her safety." (Id. ¶ 235.)

Prior to her current placement, plaintiffs allege that workers at Deveraux Hospital sexually abused plaintiff C, and that as a result, she contracted a venereal disease. (Id. ¶ 222.) Plaintiff C told her sister and her mother, Parent 1, that workers at the facility were touching her inappropriately, would threaten to hit her if she told, and would come in her room so that she could not leave. (Id. ¶ 224.) The abuse was so severe that she was unable to sit down, and plaintiff C's family noticed pinching and bite marks on her breasts. (Id. ¶¶ 223, 225.) Plaintiffs allege that management would not listen to her complaints, nor would DHS or her social workers. (Id. ¶ 225.) DHS social workers Tasha Carter and Kaheem Bowes witnessed plaintiff C's condition, and finally removed her from the facility, but this only occurred after C "suffer[ed] the abuse for an extended period of time." (Id. ¶ 226.)

Plaintiff C was placed at the Laurel Ridge residential facility in Texas for two and a half years. (Id. ¶ 228.) The Third Amended Complaint avers that in 1997, "Laurel Ridge had its license revoked by the state of Texas," and in the 2006-2007 period—during or near the time that plaintiff C was a resident—"Laurel Ridge failed federal safety inspections." (Id. ¶ 230.) While at Laurel Ridge, plaintiffs allege that "[plaintiff] C was abused, neglected, improperly medicated and provided with unauthorized medical procedures." (Id. ¶ 223-24.)

### (C)    Plaintiff E

Finally, plaintiffs allege injury to plaintiff E, and aver that he was previously "starved by his caretaker" who " was the subject of reports of abuse against [plaintiff] E that were not investigated by DHS, notwithstanding DHS's knowledge of [plaintiff] E's dangerous situation."

(Id. ¶ 246.)  Plaintiff E has been placed in three or four unsafe residential settings, has suffered

abuse, and has had two broken limbs while in DHS custody.  (Id. ¶¶ 247, 249.)  Plaintiff E has

also suffered from misadministration of medications on two occasions "as a result of DHS's

failures to provide adequate, safe and appropriate medical treatment, instructions and

documentation to DHS custodial caretakers."  (Id. ¶ 248.)  Plaintiffs also allege that "[plaintiff] E

has been forcefully medicated to the point where at time he has looked like a zombie.  During

these times, as a result of the medication, he was not rational and could not comprehend his

surroundings.  The medication is unneeded, but is administered to him to keep him quiet from

complaining about DHS's inappropriate care of him."  (Id. ¶ 254.)  Further, plaintiffs aver that

"[plaintiff] E has not been dressed in a proper manner, his clothes are too large to fit him

comfortably, his shoes are mismatched and have holes in them, and he smells like urine." (Id. ¶

250.)  While a resident in one residential facility, plaintiffs state that "[plaintiff] E was forced to

share dirty shirts and underpants with the other residents" and "[t]he clothes purchased for him

by his mother at a mall during a visit were not provided to E."  (Id. ¶ 255.) Finally, plaintiffs state

that "DHS has failed to adequately supervise or investigate [plaintiff] E's conditions of custody,"

which resulted in injury.  (Id. ¶ 256.)

The Court concludes that the Third Amended Complaint sufficiently avers that policies or

customs of City Defendants—including a failure to supervise child placements, investigate

reports of abuse and neglect, provide full information on medical conditions and treatment to

caregivers—resulted in actual or imminent injury to plaintiffs.  Thus, plaintiffs satisfy this

element of Article III standing with respect to City Defendants.

### (ii)     Commonwealth Defendants

Commonwealth Defendants also argue that plaintiffs fail to satisfy the causation element of standing. They assert that plaintiffs' "allegations do not explain how the Department's restoration of DHS's licenses caused the alleged injuries suffered by Plaintiffs nor rule out the possibility that the alleged harm suffered by Plaintiffs was caused by the actions of a third party." (Com. Defs.' 8.)

The Court disagrees. In their Third Amended Complaint, plaintiffs allege that on three occasions—in 1988, 1992, and 2007—DPW revoked DHS's full child welfare program license as a result of DHS's failure to operate a safe child welfare agency. In each instance, plaintiffs aver that DPW issued three six-month provisional licenses, and then restored DHS's full license despite continuing child safety violations in order to avoid a legally-required take-over of DHS. (3d Am. Compl. ¶¶ 76-82, 102-114, 127-133.) According to plaintiffs, "DPW has knowingly and purposefully engaged in a policy of pretextually restoring DHS's licenses even though the agency, over a 20 year period, was considered to be unsafe by any standards of professional practice. These actions . . . place DHS custodial children at risk of continued harm, or imm[i]nent harm, and a substantial likelihood exists that such harm will continue into the future." (Id. ¶¶ 276, 280.)

The Court concludes that the Third Amended Complaint contains sufficient allegations that plaintiffs' injuries are fairly traceable to the Commonwealth Defendants' practice of inappropriately restoring DHS's licenses. Thus, plaintiffs satisfy this element of Article III standing with respect to Commonwealth Defendants.

### c.      Redressability

City Defendants attack the final element of plaintiffs' Article III standing, redressability, in their reply brief, arguing that plaintiffs' requested relief—a injunction compelling City Defendants to cease all actions that violate the constitutional rights of the plaintiff class—cannot redress injuries suffered by plaintiffs in the past when they were lawfully assigned to out-of-state residential facilities by the Court of Common Pleas.  (City Defs.' Reply 12-13.)  Plaintiffs argue that "[a] federal injunction, tailored to address Plaintiffs' concern that DHS is not meeting its minimum requirements under the Fourteenth Amendment will, in fact, force DHS to comply with those requirements."  (Pls.' Resp. 119-120.)  For example, DHS's failure to conduct face-to-face visits, execute appropriate safety assessments, investigate reports of abuse and neglect, and keep accurate and timely records—the key to plaintiffs' allegations in this case—would be remedied by the relief plaintiffs seek.  The Court agrees that the relief plaintiffs seek is capable of redressing the alleged injuries by City Defendants.

Commonwealth Defendants argue that "[w]ithout an explanation of how the conduct of the Commonwealth Defendants caused their alleged harm, any request for relief is unavailing." (Com. Defs.' Mot. 9.)  However, as the has Court concluded that plaintiffs have alleged a causal link between Commonwealth Defendants' conduct and plaintiffs' injury, see Part IV.A.1.b, and plaintiffs seek an injunction that will prohibit DPW from continuing the alleged practice of reinstating full licenses to DHS despite ongoing child safety violations, the Court rejects this argument.  Plaintiffs satisfy the redressability element of Article III standing with respect to Commonwealth Defendants.

2. **Rooker-Feldman**

In their Motion to Dismiss, City Defendants argue that the Rooker-Feldman doctrine bars this Court's consideration of this case, as plaintiffs are parties to ongoing state judicial supervision of their dependency status. For the reasons set forth below, the Court rejects this argument, and concludes that Rooker-Feldman does not deprive this Court of subject matter jurisdiction over plaintiffs' case.

The Rooker-Feldman doctrine originated in, and takes its name from, two Supreme Court cases—Rooker v. Fidelity Trust Co., 263 U.S. 413 (1923), and District of Columbia Court of Appeals v. Feldman, 460 U.S. 462 (1983)—which held that federal district courts may not sit as appellate courts to review state-court judgments. "Federal district courts . . . are empowered to exercise original, not appellate, jurisdiction. Plaintiffs in Rooker and Feldman had litigated and lost in state court. Their federal complaints . . . essentially invited federal courts of first instance to review and reverse unfavorable state-court judgments." Exxon Mobil Corp. v. Saudi Basic Indus. Corp., 544 U.S. 280, 283 (2005).

The Rooker and Feldman Courts made clear that federal district courts lack subject matter jurisdiction to hear appeals of state-court judgments. Id. at 283-84. The Supreme Court, however, has cautioned that Rooker-Feldman is a "narrow doctrine." Lance v. Dennis, 546 U.S. 459, 464 (2006). Lower federal courts are not "divested of subject-matter jurisdiction simply because a party attempts to litigate in federal court a matter previously litigated in state court." Turner v. Crawford Square Apartments III, L.P., 449 F.3d 542, 547 (3d Cir. 2006).

In Exxon Mobil, the Supreme Court has held that the doctrine is "confined to cases of the kind from which the doctrine acquired its name: cases brought by state-court losers complaining

of injuries caused by state-court judgments rendered before the district court proceedings commenced and inviting district court review and rejection of those judgments." Exxon Mobil, 544 U.S. at 284. The Exxon Mobil Court held that the Rooker-Feldman doctrine applies in the "limited circumstances" in which a "losing party in state court filed suit in federal court after the state proceedings ended, complaining of an injury caused by the state-court judgment and seeking review and rejection of that judgment." Id. at 291. "When there is parallel state and federal litigation, Rooker-Feldman is not triggered simply by the entry of judgment in state court." Id. at 292. The federal court's concurrent jurisdiction does not vanish once the state court reaches a judgment; instead, "[d]isposition of the federal action, once the state-court adjudication is complete, would be governed by preclusion law." Id. at 293.

The Third Circuit has interpreted the Rooker-Feldman doctrine as barring the lower federal courts "from entertaining an action . . . if the relief requested effectively would reverse a state court decision or void its ruling." Taliaferro v. Darby Twp. Zoning Bd., 458 F.3d 181, 192 (3d Cir. 2006) (citation omitted). Accordingly, the Rooker-Feldman doctrine creates a jurisdictional bar where the federal claim was "actually litigated" in state court or where the federal claim is "inextricably intertwined" with a previous state-court judgment. Id. at 192-93. The Third Circuit has defined federal claims as "inextricably intertwined" when "the federal court must determine that the state court judgment was erroneously entered in order to grant the requested relief" or "the federal court must take an action that would negate the state court's judgment." Knapper v. Bankers Trust Co., 407 F.3d 573, 581 (3d Cir. 2005). In a recent opinion, the Third Circuit stated,

we conclude that there are four requirements that must be met for

the Rooker-Feldman doctrine to apply: (1) the federal plaintiff lost
in state court; (2) the plaintiff 'complain[s] of injuries caused by
[the] state-court judgments'; (3) those judgments were rendered
before the federal suit was filed; and (4) the plaintiff is inviting the
district court to review and reject the state judgments.

Great Western Mining & Mineral Co. v. Fox Rothschild LLP, --- F.3d. ---, 2010 U.S. App.

LEXIS 16210, at *17 (3d Cir. 2010) (quoting Exxon Mobil, 544 U.S. at 284) (brackets in Great

Western).  The court noted that "[t]he second and fourth requirements are the key to determining

whether a federal suit presents an independent, non-barred claim."  Id.

In their motion to dismiss, City Defendants argue that plaintiffs' federal claims are

"inextricably intertwined" with issues adjudicated in state court, and thus deprive this Court of

subject matter jurisdiction under Rooker-Feldman.  First, City Defendants describe the judicial

proceedings required for all dependent children under Pennsylvania law.  Every child adjudicated

as dependent must receive a permanency hearing at least every six months to determine "whether

placement continues to be best suited to the safety, protection, and physical, mental and moral

welfare of the child."  42 Pa. C.S. § 6351(e)(1), (3); (City Defs.' Mot. 39).  Through these

hearings, City Defendants argue that "the Court of Common Pleas continually supervises, and

enters appealable orders with respect to, the safety of dependent children."  (City Defs.' Mot. 40.)

Dependency orders may be appealed by the Child Advocate or by the child's natural parent, and

City Defendants assert that if plaintiffs "believed themselves to be unsafe, or had they otherwise

been dissatisfied with the findings or placement approvals rendered by the Court of Common

Pleas," they could have appealed their dependency orders.  (Id. at 41.)  City Defendants argue

that plaintiffs bring this separate federal action, which requires that the Court "negate Judge

Anders' judgment, i.e., declare that his orders of August 12 declaring the children safe were

24

erroneously entered." (Id. at 42.) As a result, City Defendants assert that plaintiffs' federal claims are barred by Rooker-Feldman as "inextricably intertwined" with the issue of safety determined by the Court of Common Pleas.

The Court disagrees. While there is a general similarity between plaintiffs' federal claims and those adjudicated in state court—namely, the issue of child safety—each court's inquiry is separate and distinct. The Court of Common Pleas must determine whether a child's *placement* is suited to their safety and welfare. See 42 Pa. C.S. § 6351(e)(1). Plaintiffs ask this Court, however, to determine a much broader question: whether the "dangerous and reckless policies and practices of DHS . . . violate the Constitutional rights of Philadelphia's DHS-custodial children . . . ." (3d Am. Compl. ¶ 2.)

Further, plaintiffs' federal claims do not trigger the application of Rooker-Feldman under either Knapper or Great Western. Knapper provides that "[a] federal claim is inextricably intertwined with an issue adjudicated by a state court when . . . the federal court must determine that the state court judgment was erroneously entered in order to grant the requested relief" or when "the federal court must take an action that would negate the state court's judgment." 407 F.3d at 581. Great Western requires that plaintiff "complain[s] of injuries caused by [the] state-court judgments" and asks "the district court to review and reject the state judgments." Great Western, 2010 U.S. App. LEXIS 16210, at *17 (brackets in Great Western). Neither case dictates the application of Rooker-Feldman in this case. Plaintiffs in this case request a declaratory judgment stating the defendants have violated the constitutional rights of the plaintiff class; an injunction prohibiting defendants from violating plaintiffs' constitutional rights; and the appointment of "a Monitor, receiver, Trustee, or Master with full authority to oversee and direct

the implementation of all injunctive relief . . . ." (3d Am. Compl. 99.) Granting the relief plaintiffs request does not require this Court to review and reject Judge Anders's ruling as to plaintiffs' placements on August 12, 2009. Further, plaintiffs do not complain of an injury caused by the state court judgment itself. Plaintiffs do not request that they be removed from their current placements, but rather that DHS be required to ensure child safety through adequate policies and procedures. When "a federal plaintiff asserts injury caused by the defendant's actions and not by the state-court judgment, Rooker-Feldman is not a bar to federal jurisdiction." Great Western, 2010 U.S. App. LEXIS 16210, at *20. Thus, the Court concludes that plaintiffs' federal claims are not barred by the Rooker-Feldman doctrine.

City Defendants also cite this Court's decision in Givens v. Walker, No. 04-1624, 2005 U.S. Dist. LEXIS 14691 (E.D. Pa. July 20, 2005), in which the Court applied Rooker-Feldman to dismiss plaintiff's claims. In that case, the Court concluded that plaintiff's claims were barred by Rooker-Feldman because "[t]o grant plaintiff relief with respect to the child support proceedings or the detention of his son would be the functional equivalent of an appeal from the state court ruling and would render the state court judgment ineffectual." Id. at *15-*16. However, in the this case, plaintiffs present an independent federal claim that does not seek to appeal the state court judgment or render ineffectual the state court judgment. As a result, the reasoning of Givens is inapplicable.

For the reasons stated above, the Court rejects City Defendants' argument that plaintiffs lack jurisdiction under Rooker-Feldman. Accordingly, there is subject matter jurisdiction in this Court.

**B.      Challenges Under Rule 12(b)(6)**

City Defendants and Commonwealth Defendants also challenge plaintiffs' Third

Amended Complaint under Federal Rule of Civil Procedure 12(b)(6).  City Defendants argue that

plaintiffs' averments in the Third Amended Complaint are insufficient to state a cause of action

under the requirements of <u>Monell v. Department of Social Services</u>, 436 U.S. 658 (1978).

Commonwealth Defendants present four arguments under Rule 12(b)(6): (1) plaintiffs have

failed to plead facts sufficient to support a claim against Commonwealth Defendants; (2)

plaintiffs have failed to plead facts sufficient to confer subject matter jurisdiction over the claims

against the Governor; (3) plaintiffs have not alleged involuntary state custody; and (4) plaintiff

parents have not alleged a violation of their own rights.  For the reasons stated below, the Court

denies City Defendants' 12(b)(6) claim and denies in part and grants in part Commonwealth

Defendants' 12(b)(6) claims.  Specifically, the Court grants Commonwealth Defendants' motion

to dismiss Parent 1's independent claims, and her related class action claims, for failure to state a

violation of her own rights, and dismisses these claims.

**1.      Plaintiffs' Third Amended Complaint States a Cause of Action Under
<u>Monell</u> Against the City Defendants**

To establish liability under <u>Monell v. Department of Social Services</u>, 436 U.S. 658

(1978), plaintiffs must "identify a municipal 'policy' or 'custom' that caused the plaintiff[s']

injury."  <u>Bd. of the County Comm'rs of Bryan County v. Brown</u>, 520 U.S. 397, 403 (1997); <u>see

also</u> <u>City of Canton, Ohio v. Harris</u>, 489 U.S. 378, 385 (1989); <u>Berg v. County of Allegheny</u>, 219

F.3d 261, 275 (3d Cir. 2000).  A municipal "policy" may arise from the "decisions of [a

municipality's] duly constituted legislative body or of those officials whose acts may fairly be

said to be those of the municipality." Brown, 520 U.S. at 403-04. A municipal "custom" may be a practice that has not been formally approved, but is "so widespread as to have the force of law." Id. at 404. In their motion to dismiss, City Defendants argue that plaintiffs fail to "plausibly or adequately allege" that there was "official deprivation of a named plaintiff's constitutional rights, an identifiable policy or custom approved by [Mayor Nutter or Commissioner Ambrose], and a causal link between the policy or custom and the alleged injury." (City Defs.' Mot. 47.)

To state a claim under Monell, plaintiffs must allege an injury. Reprising their argument on Article III standing, City Defendants assert that "there are no facts alleged which plausibly show that any individual minor plaintiff 'is likely to suffer from future injury' as a result of a policy or custom of the City Defendants[] if the requested injunction is not entered." (Id. at 47.) The Court has concluded that plaintiffs have alleged actual and imminent harm in their Third Amended Complaint. See Part IV.A.1.a. Thus, the Court rejects City Defendants' challenge to plaintiffs' Monell claim on this ground.

Next, City Defendants argue that "a claim for injunctive relief against a specific municipal official requires a showing that the named official authorized or approved the allegedly unconstitutional conduct by subordinates." (Id. at 49.) As a result, plaintiffs' "[a]llegation that Mayor Nutter and Commissioner Ambrose have failed (so far) to correct the problems they inherited to the satisfaction of these minor plaintiffs and their parents" does not "support an injunctive claim against named officials." (Id. at 50-51 (citing Rizzo v. Goode, 423 U.S. 362, 371 (1976).) The Court disagrees.

As the Third Circuit explained in Andrews v. Philadelphia, 895 F.2d 1469 (3d Cir. 1990),

plaintiffs may establish <u>Monell</u> liability by "show[ing] that a policymaker is responsible either for the policy or, through acquiescence, for the custom." <u>Id.</u> at 1480; <u>see also</u> <u>Jett v. Dallas Indep. Sch. Dist.</u>, 491 U.S. 701, 737 (1989) ("It is for the jury to determine whether such officials' decisions have caused the deprivation of rights at issue (1) by policies which affirmatively command that it occur . . . or (2) by acquiescence in a longstanding practice or custom which constitutes the standard operating procedure of the local governmental entity."). In this case, plaintiffs allege that City Defendants' "deliberate indifference, lack of compliance and failure to adhere to and enforce child safety standards . . . constitutes a longstanding official policy or practice, or custom, of the City of Philadelphia . . ., which is undertaken[], approved[,] accepted[,] and/or acquiesced to, by the Official Capacity Defendants in this action, and by their predecessors in their respective official capacities." (3d Am. Compl. ¶ 288.) Plaintiffs also aver that defendants Mayor Nutter and Commissioner Ambrose "ha[ve] continued the policy and practice of [their] predecessors by failing to take affirmative actions to ensure DHS compliance, knowing of the risks to children in DHS custody absent such compliance." (<u>Id.</u> ¶¶ 290-92.) For example, plaintiffs claim that the Plan and Budget published by DHS on July 10, 2009 "identif[ies] the same familiar areas of concern regarding child safety standards"—including violations relating to supervisory oversight, safety assessments and plans; permanency plans; and monthly visitations—that have eluded reform over a twenty-year period. (<u>Id.</u> ¶ 173.) Finally, plaintiffs allege that the Community Oversight Board, created by Mayor John Street to monitor DHS reform and continued by Executive Order of Mayor Nutter in 2008, has proved itself unable "to remedy the systemic crisis" at DHS. (<u>Id.</u> ¶ 176.) The Court concludes that these and related allegations sufficiently plead a policy or custom and state a cause of action under <u>Monell</u>.

Finally, City Defendants argue that plaintiffs must "allege specific facts showing that an identifiable policy or custom newly and specifically approved by Mayor Nutter and Commissioner Ambrose threatens imminent harm to specific named plaintiffs." (City Defs.' Mot. 52.) City Defendants claim that the Third Amended Complaint does not meet this standard, as plaintiffs cannot "explain[] how policies of Mayor Nutter and Commissioner Ambrose are likely to cause injury" to plaintiffs at secure facilities out-of-state or at local foster homes. (Id.) Continuing, they conclude that "permitting children to remain in a facility where there have been problems in the past is not, in itself, an actionable 'policy' within the terms of <u>Monell</u>, and there are no plausible allegations that such a decision is causing *imminent* harm." (Id. at 54.)

The Court disagrees. First, the Court rejects City Defendants' position that plaintiffs must identify a policy or custom "newly and specifically approved by Mayor Nutter and Commissioner Ambrose" that threatens injury to plaintiffs. As stated above, plaintiffs have adequately plead that municipal officials acquiesced in existing DHS customs, and this is sufficient to state a claim under <u>Monell</u>. See Andrews, 895 F.2d at 1480-81. Second, while City Defendants attempt to separate the "policies of Mayor Nutter and Commissioner Ambrose" from the actions of "private caretakers," the heart of plaintiffs' claim is that DHS's policies and customs are noncompliant with child safety standards—and that this puts plaintiffs in harm's way, not just during their current placements, but until they are no longer in DHS custody. For example, plaintiffs allege that DHS case workers were slow to respond to reports of abuse at residential treatment facilities and foster home placements, which resulted in greater physical and emotional harm to plaintiffs. (See, e.g., 3d Am. Compl. ¶¶108, 223-26, 246.) This kind of allegation, which is made repeatedly in the Third Amended Complaint, demonstrates that

plaintiffs have plead sufficient facts to allege that City Defendants' "'policy' or 'custom' []
caused the plaintiff[s'] injury."  See Brown, 520 U.S. at 403.

    2.    **Plaintiffs' Third Amended Complaint States a Claim Against the
Commonwealth Defendants Upon Which Relief Can Be Granted**

Commonwealth Defendants present a number of arguments in support of their motion to
dismiss the Third Amended Complaint for failure to state a claim upon which relief can be
granted.  The Court addresses each of these arguments below.

    a.    **Plaintiffs Plead Sufficient Facts to Support a Claim Against
Commonwealth Defendants**

In their Motion to Dismiss, Commonwealth Defendants argue that plaintiffs' claims
against the Commonwealth are conclusory and that "the factual allegations . . . are sparse and
insufficient to state a claim" under substantive due process.  (Com. Defs.' Mot. 12.)  Continuing,
they state, "[a]llegations that the Commonwealth issued full licenses to DHS on three occasions,
despite ongoing violations of the licensing requirements, even if true, at best speak to possible
ongoing violations of state law."  (Id. at 13.)

The Court disagrees, and concludes that plaintiffs have provided sufficient factual
allegations to state a claim against Commonwealth Defendants.  Children in state custody "may
state a claim for violation of their substantive due process rights based upon their right to
freedom from harm under the fourteenth amendment of the United States Constitution."  Baby
Neal v. Casey, 821 F. Supp. 320, 335 (E.D. Pa. 1993); see DeShaney v. Winnebago County
Dep't of Social Servs., 489 U.S. 189, 200 (1989).  In their Third Amended Complaint, plaintiffs
allege that Commonwealth Defendants on three occasions—in 1988, 1992, and 2007—revoked

DHS's full child welfare program license "as a result of [DHS's] failure to comply with law, which endangered children receiving services from DHS." (3d Am. Compl. ¶ 102; <u>see also</u> <u>id.</u> ¶¶ 76, 129.) In each instance, plaintiffs aver that DPW issued three six-month provisional licenses, and then restored DHS's full license despite continuing child safety violations in order to avoid a legally-required take-over of DHS. (<u>Id.</u> ¶¶ 77, 110, 133.) By restoring the licenses, plaintiffs claim that DPW "place[d] DHS custodial children at risk of continued harm, or imminent harm, and a substantial likelihood exists that such harm will continue into the future." (Id. ¶¶ 276, 280.) Plaintiffs state that "to this day, the problems at DHS that caused the 19[88], 1992, and 2007-related licensing actions still have not been cured." (<u>Id.</u> ¶137.) For example, in 1992, DPW reported a number of DHS violations from a survey of foster home records, including: missing and inaccurate information in child records; failure to keep timely records on the conditions of each child in its custody; failure to properly investigate reports of abuse and neglect; and failure to advise foster homes on necessary medical information related to the child. (<u>Id.</u> ¶¶ 105-06.) These same allegations are made by plaintiffs in their Third Amended Complaint, filed in 2009. Thus, the Court concludes that plaintiffs have stated a claim against Commonwealth Defendants, and denies their motion to dismiss on this ground.

> **b.** **Plaintiffs Plead Facts Sufficient to Confer Subject Matter Jurisdiction Over the Claims Against the Governor**

Commonwealth Defendants also aver that the "Third Amended Complaint is wholly devoid of any factual allegations to suggest that the Governor had personal involvement in the alleged violation of Plaintiffs' constitutional rights or that he adopted or implemented any state policy or practice with deliberate indifference to the risks of such policies or practices to

Plaintiffs."  (Com. Defs.' Mot. 14-15.)

In their Third Amended Complaint, plaintiffs allege that "the pattern and practice of pretextual license restorations . . . evidences a settled intent by the Commonwealth of Pennsylvania, acting by and through the Governor of Pennsylvania in his Official capacity as such, and former Governors in their Official capacities, to act pursuant to an affirmative Pennsylvania state policy of purposeful refusal to compel DHS to comply with reasonably safe child welfare practices."  (3d Am. Compl. ¶ 141.)  With respect to the "official policy," plaintiffs state that it "includes but is not limited to the directive, with the participation of the DPW . . . to repetitively restore DHS to full license status notwithstanding the fact that the needed changes to ensure compliance have never been implemented in a permanent manner."  (Id. ¶144.)  Plaintiffs further claim that "this policy was personally allowed to remain, reaffirmed and directed" by the current Governor and former Governors, in their official capacities, that "were the policy not affirmed, it would have been changed," and that "[t]here is no evidence to suggest that there have been any changes in said policy."  (Id. ¶¶ 142-43.)

Under Third Circuit law, "[a] defendant in a civil rights action must have personal involvement in the alleged wrongs; liability cannot be predicated solely on the operation of respondeat superior.  Personal involvement can be shown through allegations of personal direction or of actual knowledge and acquiescence. Allegations of participation or actual knowledge and acquiescence, however, must be made with appropriate particularity."  Rode v. Dellarciprete, 845 F.2d 1195, 1207 (3d Cir. 1988) (internal citations omitted).  In this case, plaintiffs do not rely on a theory of respondeat superior, as Commonwealth Defendants argue. Rather, plaintiffs allege that Governor Rendell reaffirmed and acquiesced in an official policy in

the Commonwealth of Pennsylvania that allowed DPW to reinstate full licenses to DHS—even when the violations found at DHS had not been cured.  Thus, the Court concludes that plaintiffs meet the standard set forth in Rode, and denies Commonwealth Defendants' motion to dismiss the claims against the Governor in his official capacity.

### c. Plaintiffs Have Sufficiently Alleged Involuntary State Custody

Commonwealth Defendants argue that plaintiffs do not properly state a violation of their Fourteenth Amendment rights, as they do "not allege[] that they were placed in the custody of DHS involuntarily."  (Com. Defs.' Mot. 19.)

In Nicini v. Morra, 212 F.3d 798, 808 (3d Cir. 2000), the Third Circuit held that "when the state places a child in state-regulated foster care, the state has entered into a special relationship with that child which imposes upon it certain affirmative duties" for child safety and well-being and that "failure to perform such duties can give rise . . . to liability under section 1983."  The court later clarified in Torisky v. Schweiker, 446 F.3d 438, 446 (3d Cir. 2006), that "an individual's voluntary submission to state custody is not a 'deprivation of liberty' sufficient to trigger" a duty under the Fourteenth Amendment.  However, the Torisky court also recognized that "even commitments formally labeled as 'voluntary' may arguably amount to de facto deprivations of liberty" and supported "looking beyond the label of an individual's confinement to ascertain" whether a deprivation of liberty had occurred.  Id. at 446-47.  For example, individuals who voluntarily enter state institutions may then be subject to limitations with respect to their ability to leave, or a parent who voluntarily places his child in foster care may then be subject to a court order relating to the child's placement.  Id. at 445-446.

34

Although plaintiffs have not specified in their Third Amended Complaint whether they were voluntarily or involuntarily committed to state custody, the Court concludes that plaintiffs have stated a Fourteenth Amendment claim under <u>Nicini</u> and <u>Torisky</u>. Plaintiffs claim that they are in DHS custody and have suffered unsafe conditions in residential treatment facilities and foster homes in violation of their substantive due process rights. "'When the State by the affirmative exercise of its power so restrains an individual's liberty that it renders him unable to care for himself, and at the same time fails to provide for his basic human needs—e.g., food, clothing, shelter, medical care, and reasonable safety—it transgresses the substantive limits on state action set by the . . . Due Process Clause.'" <u>Torisky</u>, 446 F.3d at 444 (quoting <u>DeShaney v. Winnebago County Dep't of Social Servs.</u>, 489 U.S. 189, 200 (1989)).

Taking the allegations of the Third Amended Complaint as a whole, the Court concludes that plaintiffs have sufficiently alleged that their "personal liberty has been substantially curtailed." <u>Fialkowski v. Greenwich Home for Children, Inc.</u>, 921 F.2d 459, 465 (3d Cir. 1990). Thus, Commonwealth Defendants' motion to dismiss on this ground is denied.

> **d.      Plaintiff Parent 1 Has Not Alleged a Violation of Her Own Rights, and Her Individual Claims Against All Defendants Must Be Dismissed**

In the Third Amended Complaint, plaintiffs state that "[t]he [minor plaintiffs'] natural parents appear as representatives of their minor children in their capacity as natural parents of such minor children, individually and on behalf of any and all other similarly situated minor children" and also that "the parents appear individually, on their own behalf, and on behalf of any and all other similarly situated parents." (3d Am. Compl. ¶ 26.) Commonwealth Defendants

assert that Parent 1's individual claims must be dismissed because she does not "allege that [her] own rights and interests have been violated and cannot rest [her] claims for relief on the legal rights of [her] children."  (Com. Defs.' Mot. 19.)

"A federal court's jurisdiction [] can be invoked only when the plaintiff [her]self has suffered 'some threatened or actual injury resulting from the putatively illegal action . . . .'" Warth v. Seldin, 422 U.S. 490, 499 (1975) (quoting Linda R. S. v. Richard D., 410 U.S. 614, 617 (1973)).  "[P]laintiff generally must assert [her] own legal rights and interests, and cannot rest [her] claim to relief on the legal rights or interests of third parties." Id.  Because the Third Amended Complaint does not allege that Parent 1 suffered a violation of her own Fourteenth Amendment rights, she does not state an individual claim upon which relief may be granted.  See Beauchamp v. Chichester Sch. Dist., No. 05-4141, 2005 U.S. Dist. LEXIS 28677, at *6-*7 (E.D. Pa. Nov. 17, 2005) (holding that parents lack standing to bring individual claims when they alleged only that their son's rights were violated).  Accordingly, the Court grants Commonwealth Defendants' motion with respect to Parent 1's individual claims, and dismisses the individual claims of Parent 1 and her claims on behalf of similarly situated parents against both Commonwealth Defendants and City Defendants.

## V.    CONCLUSION

For the reasons stated above, the Court denies City Defendants' motion to dismiss and grants in part and denies in part Commonwealth Defendants' motion to dismiss.  The Court grants Commonwealth Defendants' motion to dismiss with respect to Parent 1's individual claims, and dismisses the individual claims of Parent 1 and her claims on behalf of similarly

situated parents against all defendants.  In all other respects, Commonwealth Defendants' motion

to dismiss is denied.

An appropriate order follows.